**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**CADENCE BANK**                                                                                    **Plaintiff**

**V.**                                            **CIVIL ACTION NO.: 1:23-cv-00139-MPP-RP**
**GLOBALVISION SYSTEMS, INC.**
**and AI OASIS, INC.**                                                                    **Defendants**

**ORDER**

This cause comes before the court addressing the first-to-file rule issues which have been

raised by defendants in this case. Having considered the briefing and other submissions of the

parties, this court concludes that the first-to-file rule applies in this case and that this case should

accordingly be transferred to the Central District of California, Western Division, where it will

presumably be consolidated with the first-filed action in this matter. *See Globalvision v.*

*Cadence Bank*, Case No. 2:23-cv-08750-FMO-AJR (Ctrl. Dist. Cal. 2023).

It has long been recognized that the principle of comity requires federal district courts—

courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each

other's affairs. *E.g., Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 72 S.Ct.

219, 96 L. Ed. 200 (1952); *Covell v. Heyman,* 111 U.S. 176, 182, 4 S.Ct. 355, 358, 28 L.Ed. 390

(1884). "As between federal district courts, ... the general principle is to avoid duplicative

litigation." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96

S. Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). The concern manifestly is to avoid the waste of

duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid

piecemeal resolution of issues that call for a uniform result. *E.g., Pacesetter Systems, Inc. v.*

*Medtronic, Inc.,* 678 F.2d 93 (9th Cir. 1982). It is well established that, to avoid these ills, a

district court may, pursuant to the first-to-file rule, either stay, dismiss or transfer an action

where the issues presented can be resolved in an earlier-filed action pending in another district court involving substantially similar issues. *See, e.g. West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 730 (5th Cir. 1985).

While the above principles seem clear enough, it should be noted that there is, at least arguably, some degree of uncertainty in Fifth Circuit law regarding this court's proper role in the first-to-file context. In so stating, this court notes that the Fifth Circuit wrote in a 1997 decision that "[t]he Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir. 1997), citing *West Gulf*, 751 F.2d at 728. As discussed below, this court concludes that the California case in this matter is the first-filed one, which might seem to suggest (under the *Save Power* language above) that the California court is the one to decide these matters. However, it seems self-evident that, in order to apply this law, this court must itself make an inquiry into which case is the first-filed one – a true Catch-22 situation. Additionally, this court notes that the actual holding in *Save Power* was that "Judge McBryde's denial of the motion to transfer was an abuse of discretion," *Save Power Ltd.,* 121 F.3d at 952, and the opinion makes clear that McBryde had the second-filed case in that litigation.[1] This suggests that the second-filed judge has at least partial responsibility to resolve these matters.

This court further reiterates that, in writing the above words, the Fifth Circuit in *Save Power* cited its 1985 decision in *West Gulf*. In *West Gulf*, the Fifth Circuit made clear that "to

---

[1] Specifically, the Fifth Circuit in *Save Power* described Judge Means "as a different judge in the same division before whom a previously filed, related action is pending" and concluded that, on that basis, Judge McBryde had abused his discretion in refusing to transfer the case to Judge Means on the basis of the first-to-file rule. *Id.* at 948.

avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result . . . a district court may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district court." *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 729 (5th Cir. 1985).

Thus, the Fifth Circuit in both *Save Power* and *West Gulf* appeared to regard the second-filed judge as having, at the very least, *partial* responsibility to decide first-to-file issues. In response to e-mailed inquiries from this court (through its staff) on this issue, counsel for defendants suggested that the proper interpretation of the law in this context is that this court should make a *preliminary* inquiry into these matters but that the first-filed court has the final say. This may be the correct interpretation of the law in this context, but, lacking certainty in this regard, this court will simply give its thoughts on the applicability of the rule without any intent to bind the California district court. This court emphasizes, however, that it is by no means raising the first-to-file rule on its own motion, since defendants raised it as a defense in this case, and both sides have extensively briefed it. Indeed, both sides appear to recognize that the first-to-file rule constitutes a very significant issue in this case which needs to be addressed, and this court agrees. Moreover, this court is frankly uncertain how any other court could address this issue, since it presently has a TRO motion before it, and it must determine whether or not it is appropriate to rule upon that motion. Clearly, this court cannot wait for some other court to decide this issue which, as far as it is aware, has not even been raised in the California litigation.

In considering the first-to-file issues in this case, this court initially observes that, objectively speaking, defendants filed their California action before plaintiff filed its action in

this court.  In contending otherwise, plaintiff argues that this case should be deemed a continuation of an earlier lawsuit which it filed in Texas, but this court concludes that this action began when it was filed in the Northern District of Mississippi.  In so concluding, this court notes that plaintiff voluntarily dismissed its Texas action under 41(a)(1)(A), but it did so only after defendants had filed a Rule 12(b)(2) motion to dismiss, arguing that the Texas court lacked personal jurisdiction over it.  [Docket entry 11, Exhibit 2].  In voluntarily dismissing its Texas action, plaintiff wrote that while it "continues to believe that it is appropriate for this Court to exercise personal jurisdiction over Defendants . . . for the sake of judicial economy and efficiency, Plaintiff voluntarily dismisses this action." [Docket entry 11, Exhibit 3].

It is thus plain that plaintiff elected not to contest arguments that jurisdiction was improper in Texas, and, under these circumstances, it would strike this court as being very questionable public policy to essentially reward plaintiff under the first-to-file rule for (apparently) filing suit in the wrong jurisdiction.  In arguing otherwise, the only binding authority cited by plaintiff in its brief is the Fifth Circuit's decision in *Yesh Music v. Lakewood Church*, 727 F.3d 356 (5th Cir. 2013).  However, *Yesh* was not a first-to-file case at all, instead dealing with the issue of whether a Rule 41(a)(1) dismissal was a final judgment subject to vacatur.  *Yesh*, 727 F.3d at 360. Moreover, the Fifth Circuit in *Yesh* included language which seems quite problematic for plaintiff's first-to-file arguments, specifically that the "effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if he had never brought the first suit." *Yesh*, 727 F.3d at 359. Thus, the only federal appellate authority cited by plaintiff suggests that, once it entered a 41(a)(1)(A) dismissal in the Texas case, the legal effect was to essentially wipe the legal slate clean.  This raises the obvious question: on what basis might this court regard this case as the

4

continuation of the Texas action when the Fifth Circuit has made clear that plaintiff's voluntary dismissal of that case made it as if it had "never brought the first suit"?

This court notes that, in its brief, plaintiff only appears to have cited *Yesh* because a Texas district court did so in siding with the plaintiff in that case on first-to-file issues. *See In re Toyota Hybrid Brake Litig*., 2020 WL 6161495, at *6 (E.D. Tex. Oct. 31, 2020). In its brief, plaintiff offers no analysis or discussion of the Fifth Circuit's holding in *Yesh* itself, presumably because that holding is, when read in its totality, adverse to its position here. Moreover, the Texas district court's decision in *Toyota Hybrid* is not, of course, binding authority on this court, and it is distinguishable since it did not involve the fact pattern here, where the plaintiff only chose to voluntarily dismiss the action after serious jurisdictional concerns were raised in a motion filed by defendants. This fact aside, it appears to this court that the district court in *Toyota Hybrid* may have overlooked the Fifth Circuit's admonition in *Yesh* that the "effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if he had never brought the first suit." Indeed, while the district court cited *Yesh* in its holding, *see Toyota Hybrid*, 2020 WL 6161495 at *6, it did not quote this crucial language. This court accordingly does not find *Toyota Hybrid*'s analysis to be either complete or persuasive, and, it is, in any event, factually distinguishable from this case.

This court notes that, in *Yesh*, the question was whether the plaintiffs should be forced to suffer *negative* consequences for voluntarily dismissing their action. In concluding that they should not, the Fifth Circuit wrote that "[t]he plaintiff suffers no impairment beyond his fee for filing. Stated differently, the plaintiff is free to return to the dismissing court or other courts at a later date with the same claim." *Id.* citing *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc*., 434 F.3d 320, 324 (5th Cir. 2005). Given this holding, it would strike this court as quite unfair to state that, while a plaintiff is not able to be legally *harmed* in any way by its

voluntary dismissal, it is permitted to *benefit* from it in the first-to-file context. This court submits that such a holding would be particularly anomalous in a case such as this one, where plaintiff only voluntarily dismissed its Texas action after forcing defendants to incur the expense of filing and arguing a motion to dismiss which, at the end of the day, was not actively contested.

In the court's view, it is not difficult to imagine the sort of adverse consequences which would follow if plaintiffs' right (in the Fifth Circuit) to voluntarily dismiss an action under Rule 41(a)(1) without penalty were combined with a rule of law allowing them to *benefit* from such dismissed actions in the first-to-file context. In that scenario, parties would be heavily incentivized to, once a dispute arose, file a "quick and dirty" complaint in the nearest available courthouse, knowing full well that its allegations could not withstand a Rule 12 challenge. The plaintiffs could then voluntarily dismiss the action prior to an answer, along with a notation that a more detailed complaint would be forthcoming.

While this court does not regard plaintiff's choice to first file suit in Texas as being anywhere close to as abusive as the above hypothetical, that Texas action was, once again, dismissed under circumstances which suggest that plaintiff should have more carefully considered jurisdictional issues before filing suit there. Moreover, this court does not believe that the law would be well served by a rule of law requiring judges to assess exactly "how bad" a particular initial filing was, since this would lead to unclear standards and unpredictable results. This court submits that it makes far more sense to do what the Fifth Circuit already did in *Yesh*: namely, make a clear and unequivocal holding that the "effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if he had never brought the first suit." *Id.* With such clear legal standards in place, district judges can simply consult the dockets of the active lawsuits and determine which one of them was filed first. That is what this court has done in this case.

6

Applying the relevant Fifth Circuit standards, it seems clear that defendants filed their California action prior to this one, and even a cursory review of the complaint in that case makes it plain that it centers around the very same business compliance software at issue here. This court concludes that this meets the "substantial overlap" requirement and that the first-to-file rule accordingly applies here. Indeed, it seems quite arguable that the overlap between this case and the California one is not merely "substantial," but extreme. In so stating, this court notes that the California lawsuit alleges that:

> After the parties' license agreement expired by its terms, instead of returning the Patriot Officer software and other intellectual property in compliance with the Agreement, Defendant initiated a meritless lawsuit in Texas in an attempt to keep and use the software.

[California Complaint at 3]. More specifically, the complaint in that case alleges that:

> 20. The First Amendment to the Agreement contains a termination provision stating that the existing agreement shall remain in effect until October 4, 2023 and shall automatically renew for successive one year periods, unless either party gives written notice to the other party of its desire not to renew the Agreement at least six (6) months before the end of the initial or then-current renewal term. See Exhibit B, § 2.

> 35. By its terms, the Agreement was properly terminated on October 4, 2023 pursuant to GlobalVision's March 29, 2023 written Notice to Defendant of its decision not to renew, and therefore GlobalVision had no continuing obligation to perform under the Agreement

> 36. Pursuant to paragraph 18 of the Agreement, "[u]pon termination of this Agreement by any party for any reason, the Licensee [Defendant] will return all software and related materials to GVS [Plaintiff] along with a signed attestation thereto within 30 days of the termination." After 11 years of exceptional support and diligent service to Defendant, instead of returning all the software to Plaintiffs, as it was contractually required to do upon termination of the Agreement, Defendant instead attempted to retain and continue using the software without paying for it, by filing a Petition and Application for Temporary Restraining Order, and Temporary and Permanent Injunction against Plaintiffs on October 4, 2023, in Harris County, Texas, seeking, among other things, injunctive relief allowing its continued use of the licensed software through October 5, 2024. Defendant ignored GlobalVision's

instruction that Defendant's continued use and/or possession of the software after the Agreement's termination date was unlawful.[2]

[California Complaint at 11].

It is thus apparent that the California lawsuit and this case are, in many respects, two sides of the same coin, with each side involving the crucial issue of whether defendants did, in fact, properly provide notice of their intent not to renew the contract. Defendants insist that they did provide such notice and, that being the case, the contract expired by its terms on October 4, 2023. Defendants further contend that plaintiff's decision to keep using the software after that date represents a misappropriation of their intellectual property rights. This court therefore concludes that there is a great overlap between this case and the California case, and it cannot discern a reasonable argument otherwise.

In its brief, plaintiff notes that this does not necessarily end the matter, since "[e]ven if such overlap exists, second-filed courts may still analyze the existence of compelling circumstances unique to a particular case in response to a first-to-file challenge." *See, e.g., LifeNet, Inc. v. United States Dep't of Health and Human Servs.*, 2022 WL 2959715, at *5 (E.D. Tex. July 26, 2022). [Brief at 9]. In concluding that no "compelling circumstances" exist which would warrant disregarding the first-to-file rule in this case, this court notes that counsel for defendants represents that they are making diligent efforts to continue providing plaintiff both with access to and support for the software at issue in this case. Indeed, defendants' brief provides a highly detailed and thorough description of the steps which they are taking, in good faith, to provide customer support services for the software in this case while the legal issues here are being resolved. [Brief at 14-15]. While plaintiff disputes that this assistance is adequate, it seems clear

---

[2] This court notes that the Texas action filed by plaintiff was later dismissed after doubts arose over whether defendants were subject to personal jurisdiction in Texas.

to this court that the present situation is dramatically different, and far less urgent, than the one described in the original TRO motion. That TRO motion described the harm facing plaintiff as the complete loss of access to its compliance software, and it appears that defendants have wisely chosen to continue to provide plaintiff with access to that software for the time being at least.[3]

These considerations aside, this court continues to be troubled by the fact that plaintiff filed TRO briefing which was based upon a very selective description of the facts in this case, with no mention of the fact that defendant had a substantial notice defense, of which plaintiff was aware based upon the prior litigation in Texas. Indeed, this court notes that, in their response to plaintiff's most recent filing, defendants make notice arguments which were even more substantial than this court had initially believed. Specifically, defendants argue in their brief that:

> Defendants timely and properly provided written, six months' advance notice of termination pursuant to the terms of the parties' agreement. There can be no dispute that Plaintiff received the termination notice, as evidenced by Defendants' copies of emails and FedEx receipts, as well as the numerous emails from Plaintiff itself (attached to the Declaration of Catherine Lew) asking Defendants for a "one-month extension" of the termination date. To state the obvious, Plaintiff would not have had the need to ask for an "extension" if they had not previously been provided timely notice of termination. Yet Plaintiff did not move for injunctive relief in this Court until two weeks after the contract had expired, and apparently also did not use those six months to diligently or timely implement software from its new vendor. Such undue delay weighs heavily against granting injunctive relief.

[Brief at 3].[4]

---

[3] In concluding that this decision is a wise one, this court believes that defendants would be running a grave risk of incurring severe liability if they are later found to have improperly withdrawn plaintiff's access to the business-crucial software at issue in this case. Plaintiff notes that defendants' promise to continue providing services applies only so long as any TRO or preliminary injunction motions are outstanding. However, this court is not ruling on the merits of plaintiff's TRO motion today, and this means that the question of whether a TRO should be issued is still undecided and will presumably be addressed by the California court. This court interprets this to mean that defendants' representation that it would continue providing services is still in effect.

[4] This court notes that defendants also appear to make serious and substantial allegations in favor of their California statutory claims (discussed below), writing in their brief that:

Fourth, as detailed below, and alleged in Defendants' complaint against Plaintiff in the

While plaintiff appears to have a good faith argument that the notice provided by defendants was not that which was required by the contract, the existence of this notice defense is clearly something which should have been brought to this court's attention, so that it could make an accurate appraisal of plaintiff's likelihood of success on the merits. Moreover, this court can discern no good reason why plaintiff could not have provided counsel for defendants with notice of this TRO motion, rather than seeking *ex parte* relief. In this vein, this court notes its belief, after reading defendants' thorough briefing, that plaintiff's initial TRO motion may have overstated the extent to which defendants' attempts to negotiate a new licensing agreement represents abusive practices on their part. Specifically, defendants write that:

> Plaintiff's litigation argument that the negotiations faltered because Defendants sought to "extort" it by demanding a "6000% price increase" is both a red herring and a gross distortion of the facts. First, to be clear, the negotiations did not involve an extension of the Agreement with GlobalVision or its Patriot Officer software product at all; rather, the negotiations involved a potential new license agreement with AI Oasis for its new banking software product, called "United A.I. Network," which has numerous additional and enhanced AI features not present in Patriot Officer and therefore commands a materially higher license price. Declaration of Oliver Song ("Song Decl.") ¶ 6-7. Second, the proposed software maintenance fee quoted to Plaintiff by AI Oasis for a five-year license term -- the same license term as the initial term for Patriot Officer under the Agreement -- was far from a "6000%" price increase. According to industry norms, the price of fraud prevention software utilized by financial institutions is based partly on the size of the bank and the complexity of its operations. Id. at ¶ 8. Since the Parties entered into the Agreement in 2012, Cadence Bank's assets had nearly quadrupled in size. Id. at ¶ 4. In addition, the cumulative rate of inflation in the United States between 2012 and 2023 was over 33%. Id. at ¶ 9. AI Oasis' new proposal to Cadence Bank for a five-year license for United A.I. Network was $240,000 per year, approximately five times the original fee GlobalVision charged for Patriot Officer in 2012 -- not a 6000% increase, as Plaintiff now claims.

California Action, Defendants recently discovered that Plaintiff has been allowing unauthorized third parties that are Defendants' direct competitors to access Defendants' proprietary and trade secret software. Specifically, since March 2023, Plaintiff has allowed two of Defendants' third party competitors to log into the Patriot Officer system on over 300 separate occasions, all without Defendants' knowledge or consent. Defendants have been and will continue to be irreparably harmed by these unauthorized disclosures in the context of the highly competitive banking software industry.

[Brief at 4].

[Brief at 10].

This court will not seek to make findings regarding the parties' competing versions of the facts, since it will be for the California court to do so. This court does take this opportunity, however, to make clear that, after defendants have been given an opportunity to provide their version of events, this appears to be a much closer factual case than was suggested by plaintiff's TRO motion. Moreover, this court's concern regarding the manner in which this case has been prosecuted constitutes an additional reason for not disregarding the first-to-file rule in this case, since it does not believe that questionable litigation practices should be rewarded with success. This court notes parenthetically that transferring this action to California district court will allow plaintiff to file a new, and more even-handed, TRO motion, and thereby (potentially) obtain a fresh start with a new court. It appears to this court that plaintiff should welcome an opportunity to do so, even if that results in litigating this matter in a different state.

Another very important factor in favor of letting the California court decide these issues lies in the fact that the software agreement in this case plainly provides that "[t]his agreement shall be construed under the laws of the State of California." [Contract at 11, paragraph 24]. Without question, a California district court has much greater familiarity with California law than this court and is in a much better position to apply it. Indeed, this court notes that defendants allege that plaintiff violated a number of California statutes in this case, including California Penal Code Section 502 and the California Uniform Trade Secrets Act. This court notes that the former statute "creates a private right of action that entitles the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of Section 502(c) to bring a civil action against the violator for

11

compensatory damages and injunctive relief or other equitable relief."[5] [California complaint at 16]. This court cannot recall having applied a statute even remotely similar to Section 502(c), and it believes that a California court is in a much better position to reach a correct legal result in this regard than this court.

This court's impression, from reading defendants' California complaint, is that the law of that state is quite protective of the intellectual property rights of its companies, and it seems quite possible that this law might limit this court's ability to side with plaintiff based on considerations of equity and fairness. This court notes that, while the facts of this case now appear less egregious than they initially appeared from the TRO motion, it still looks with some degree of suspicion upon attempts by a company to use a customer's extreme reliance upon their product to demand what is at least arguably an excessive amount of money to continue providing that product. However, whether or not such tactics constitute a violation of California law or simply represent hard-nosed, legitimate business practices is another matter. Indeed, it can certainly be argued that, if defendants did, in fact, give proper notice of non-renewal in this case, then they would be within their rights in demanding a *billion* dollars to resume any provision of services. This court makes no finding as to whether this is a winning legal argument, but it does appear to be a coherent one. At any rate, given that the notice provision in the software agreement in this case will be interpreted under California law, a California court is clearly in a better position to reach a correct legal result in this regard than this court is.

---

[5] This court notes that, while plaintiff questions whether venue and/or jurisdiction properly lie with the California court, defendants noted in their California complaint that Section 502 includes language which seems specifically designed to allow courts in that state to decide cases brought under that statute. [California complaint at 4].

As noted previously, Fifth Circuit law provides that, if a court finds that a particular case is a second-filed one, the available options include staying, dismissing, or transferring the action. *West Gulf*, 751 F.2d at 730. This court will exercise the third option, since a transfer appears to be the option most likely to result in the California court being able to quickly analyze the issues in this case.[6] It is therefore ordered that this case is transferred to the Central District of California, Western Division, where it will presumably be consolidated with the first-filed action in this matter. *See Globalvision v. Cadence Bank*, Case No. 2:23-cv-08750-FMO-AJR (Ctrl. Dist. Cal. 2023).

This, the 31st day of October, 2023.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**

---

[6] In so stating, this court is not unaware of a controversy which arose recently in the Fifth Circuit regarding the transfer of a hotly contested First Amendment case. *See Def. Distributed v. Bruck*, 30 F.4th 414, 436 (5th Cir. 2022). While this court is thus cognizant of the Fifth Circuit's concerns regarding the improper transfer of cases, it reiterates that, in the first-to-file context, the Fifth Circuit held the second-filed judge to have abused his discretion in *not* transferring the case to the first-filed court. *Save Power*, 121 F.3d at 950. This court also notes that, in light of the pending TRO motion, it is important that this matter be brought before the appropriate court as soon as possible. This court believes, once again, that a transfer (rather than a stay or dismissal) best accomplishes this goal.